HENRY C. PITNEY, JOHN R. EMERY, ALFRED REED,
FREDERIC W. STEVENS AND MARTIN P.
GREY, VICE-CHANCELLORS.

---

GEORGE GILDERSLEEVE, MELVINA G. HONEYMAN and
ANNIE M. SNYDER

*v.*

WILLIAM B. STRATTON, FRANK M. STRATTON et al.

[Filed January 11th, 1897.]

Complainants and defendant jointly purchased lands, the price being paid by defendant. It was agreed that defendant should take title in fee, that the land should be plótted and lots sold by defendant until he was repaid, and that then defendant should be vested with title in trust for the joint owners.

(1)

Gildersleeve *v.* Stratton.

Complainants stipulated that they would work to facilitate the sale of the lots.—*Held*, that the agreement was an executed declaration in trust, and not an executory agreement dependent on the performance by complainants of the stipulation to facilitate sales.

On motion to strike out bill under rule 213, in place of demurrer.

The bill alleges that six persons, among whom was Frederick H. McNamee, were interested in a tract of land in Bergen county, known as the "Old Paulison Farm," which had been conveyed to one of the six, Nathaniel F. Jones, on the 4th of August, 1890; that on the 25th day of the same August, the six persons entered into a writing under their respective hands and seals, which, after reciting that the six had become interested in the purchase of the farm, that it had been conveyed to Jones, that the purchase-money had been advanced by William D. Stratton, another of the six, and that their several rights and interests should be declared and affirmed, proceeded to an agreement between the parties, in consideration of $1, by each of them to the other paid—first, that the general object for which the farm was bought was that it might be divided into lots and thus sold again; second, that Jones should convey the land to Stratton; third, that until Stratton should be paid his advances with interest he should hold the land in fee as his individual property; fourth, that under such arrangements as might be made by the six the land should be surveyed, plotted and staked, and streets and avenues should be laid out and opened across the same, the expense whereof, except the expense of surveying, plotting and mapping, which should be primarily borne by Stratton as an advance to be repaid, should be paid from the proceeds of sales; fifth, that when, from the proceeds of sales, Stratton should be repaid all his advances with interest, "then," following the language of the document,

"the said Stratton shall by proper conveyance become vested with the title to all the said land remaining unsold as trustee for all the parties to this instrument; provided, however, that this instrument shall not be construed upon said land being paid for and the said disbursements being repaid to the said Stratton, as vesting an undivided interest in the fee of said lands in any of the

parties hereto, it being declared the purpose of all said parties that the said remaining part of said lands shall become vested in Stratton as trustee for the purpose of selling and conveying title to purchasers. If, however, when the said Stratton becomes so vested with the title of said lands as such trustees, the parties hereto, consistent with the rights and interests of all concerned, can make actual division of the said lands in proportion to this respective rights and interests, then each or all of said parties, the others consenting, may become vested with separate title to the said lands;"

sixth, that Stratton should not be required, by any party, before he should be fully paid, to account, but that his books of account should be kept open to inspection by the parties; seventh, that after Stratton should convey the title to himself in trust, the profits from sales should be equally divided between the six parties; eighth, that the five parties other than Stratton, agreed with Stratton that they would, by proper and zealous efforts on their part, endeavor to find a market for the lands and diligently strive to find acceptable purchasers therefor; ninth, that Stratton agreed that, upon being paid as indicated, he would by proper conveyance cause himself to become vested with the titles to the lands remaining unsold as trustee, and, accepting the office of trustee, duly declare a proper trust in himself; tenth, that each of the parties should be consulted as to the general policy of sale and disposition of the lands, but that Stratton should have the power to decide in case of division of opinion until he should be paid, and thereafter his power might be changed, but, after three years from the conveyance to him in trust, he might sell out the land and be relieved of his trust.

The bill further alleges that Stratton sold a large number of lots and derived from the proceeds of sale thereof sufficient to reimburse him his advances with interest, and then conveyed the remainder of the property to his son Frank, who had knowledge of the document above referred to, who made additional sales, but that there yet remains land undisposed of by the son, the legal title to which stands in his name; also, that Patrick H. McNamee, above referred to, on the 30th of September, 1890, by writing, assigned his interest under the document of the 25th of August, 1890, to George Gildersleeve, who, in turn, assigned "to the heirs of Caleb D. Gildersleeve," who are the

complainants, and that William B. Stratton or his son Frank have acquired the interest of the others of the six parties to the document of August 25th, 1890.

The bill seeks a decree which shall hold the Strattons to have been trustees, and Frank Stratton to be trustee, and enforce the trust, and require the Strattons to account.

By an amendment of the bill, made by consent of the parties to the suit, after the notice to strike out was served, it is further alleged that after the document of August 25th, 1890, was entered into, and both before and after he assigned his interest thereunder, McNamee, by proper and zealous efforts on his part, endeavored to find a market for the lands involved and did diligently strive to find acceptable purchasers therefor, and did find a market and purchasers for a large part of the lands to whom conveyances of the same were made by William D. Stratton, and continued such efforts until William D. Stratton was fully paid, and also that William D. Stratton knew of the assignments of the interest of McNamee, and, acquiescing therein, promised and agreed to account to the complainants for their share of the proceeds of sales of the lands.

The motion to strike out the bill has been argued as though it related to the bill thus amended.

*Mr. Otto Crouse,* for the motion.

*Mr. Allan L. McDermott, contra.*

THE CHANCELLOR.

It is urged in support of the motion, first, that the interest of McNamee, under the writing of August 25th, 1890, was not assignable so as to give the complainants a right to invoke the aid of the court in its enforcement, because the agreement involved the performance of personal services by McNamee ; and second, because specific performance of an agreement will not be enforced where, as in this case, no mutuality of right or obligation and of remedy exist between the complainants and defendant.

These objections are based upon the assumption that the writing of August, 1890, is an executory agreement upon the performance of which the rights of the parties depend. I do not regard it as a mere covenant for rights and interests to arise in the future. It is professedly a declaration and affirmation of existing rights and interests, added to which are executory agreements touching the repayment of loans and the future realization of the value of those rights.

Six parties had become interested in a scheme to divide "the old Paulison farm" into lots and blocks and sell it at profit. They had secured its conveyance to Jones, one of their number. Another of their number, William D. Stratton, agreed to advance or lend the purchase-money which they were to pay for the farm. At this point the writing in question was made with the purpose, as expressly defined, to declare and affirm the several rights of interests of the six parties to it. Then it proceeded, first, to provide for the repayment of Stratton's advances with interest, to accomplish which it assented that he should be clothed with the title to the land in fee, ostensibly free from any trusts, so that he would with the greatest freedom be enabled to make sale of the lots and repay himself, but, notwithstanding he thus took the fee, all the parties to the writing were to participate in the adoption of a scheme, according to which the land should be plotted and streets and avenues upon it should be opened, a matter vital to the success of the undertaking, and likewise all six were to be consulted as to the general policy to be adopted in conducting the contemplated sales, with the restriction, however, that until Stratton should be repaid he should have the power to decide, in case there should be a division of opinion as to the method of selling. He was not to account until he should be repaid, but yet he was to keep books of account which should be open to inspection by the parties. Thus, he was afforded as effectual a security for the return of the money he should advance as the land would afford, and at the same time means of satisfactory supervision of his acts were served for the protection of the rights of those who were ultimately to take. It is perceived that the five parties, other than

Stratton, did not renounce their rights, except so far as was necessary to give effect to the scheme of. security which the writing prescribed for the repayment of Stratton's advances. Subject to the encumbrance created by that scheme, they, with Stratton, in equal shares, were the holders of the equitable title to the land.

The paper further provided that when the repayment should be accomplished Stratton was to convey so as to openly put the title in himself, in a trust which would admit of the continuance of sales and afford each of the six parties his proper share of the property. With the consent of all, when Stratton should be repaid, partition of the remaining land might be made among the six.

I cannot but regard this document as an executed declaration of trust. It purports to be made for valuable consideration, and its recitals and the event of the repayment of Stratton and a surplus of land remaining show that it is founded in valuable pre-existing interests. It is true that the instrument is couched in language which contemplates that no trust was to exist until Stratton should be repaid, and at the same time, and that when he should be repaid a well-defined trust should be made, yet it at the same time recognizes and exactly defines existing rights in all the parties to the instrument. There exists an underlying trust given between those parties.

I have not overlooked the fact that five of the parties agreed with Stratton that they would work to facilitate the sale of the property, and that Stratton in turn agreed that when he was paid he would become vested with the title openly in trust.

The argument in favor of the motion rests upon the supposed effect of such agreements.

I do not understand that the continuance of the rights of McNamee were made dependent upon his services. They were not subjected to forfeiture for his non-performance of them. I think that his agreement to render personal services was a personal undertaking with Stratton merely for the security of Stratton's repayment. That such was the contemplation of the parties to the agreement is made conspicuous by the provisions

Gildersleeve v. Stratton.

that the agreement for personal service was between Stratton alone and the other five together, that when Stratton should be repaid he should openly declare the trust, and that then there might be a partition and Stratton might be deposed from the supreme control of subsequent sale.

It appears to me, also, that the same construction of the agreement is applicable in answer to the argument as to lack of mutuality in remedy. The agreement for personal services was with Stratton alone, having for its object the security of his repayment. He did not stipulate for a forfeiture of rights as a penalty for the non-performance of that service. Irrespective of the services, he holds as trustee, and though he may not be able to compel the performance of the services he cannot set such inability up to defeat the execution of his duty as trustee.

But this question of mutuality does not arise, for the bill alleges that Stratton has been repaid, and the amendment of the bill shows that when the bill was filed and enforcement of the trust was asked, McNamee had personally performed the services which the agreement required.·

I will deny the motion.

Afterwards the bill of complaint was amended and answers thereto were filed, and the cause came on to be heard on the pleadings and proofs, whereupon a decree was made on the advice of Vice-Chancellor Stevens, dated January 13th, 1898, who filed his conclusions as follows:

I am so clear about this case that I do not think any benefit will arise from delaying my decision of it. The main question has already been decided. ·The chancellor has construed the agreement, and I must take his construction of it to be the law of .this case. I may be permitted to say, however, that I myself entirely agree with the opinion that the stipulations contained in the paragraph at the end of the fourth clause of the agreement, if unperformed by any of the parties mentioned in it, causes no forfeiture of their interests. If there is a breach of this clause of the contract it may give rise to an action for

damages, and possibly such damages as might be assessed in consequence of any breach would have to be deducted from the share of Mr. McNamee, but that is the utmost extent to which, as it seems to me, it is possible to go so far as the construction of the agreement is concerned. Equity leans against forfeiture—gives compensation in lieu of forfeiture, if it can. In this case there is absolutely no clause declaring that a forfeiture shall result from the non-performance of any term of this agreement. It might as well be contended that Mr. Stratton would forfeit his interest—all his interest in the property—if he had failed to perform any term of this agreement, and this would be absurd. I have no doubt, therefore, about the propriety of the view taken by the chancellor, and if I had I would be bound by his opinion.

Assuming this opinion to be correct, the case is entirely free from doubt.

[Here follows a discussion of the evidence.]